J-S01032-26

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: O.M., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: J.M., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1013 WDA 2025 |

Appeal from the Order Entered July 11, 2025
In the Court of Common Pleas of Clarion County Juvenile Division at
No(s): 37 DP 2023

| | | |
|---|---|---|
| IN THE INTEREST OF: L.M., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: J.M., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1014 WDA 2025 |

Appeal from the Order Entered July 11, 2025
In the Court of Common Pleas of Clarion County Juvenile Division at
No(s): 36 DP 2023

| | | |
|---|---|---|
| IN THE INTEREST OF: O.M., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: J.M., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1020 WDA 2025 |

Appeal from the Order Entered July 10, 2025
In the Court of Common Pleas of Clarion County Orphans' Court at
No(s):  121 OC 2025

| | | |
|---|---|---|
| IN THE INTEREST OF: L.M., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |

J-S01032-26

APPEAL OF: J.M., FATHER

No. 1021 WDA 2025

Appeal from the Order Entered July 10, 2025
In the Court of Common Pleas of Clarion County Orphans' Court at
No(s):  120 OC 2025

BEFORE:  BOWES, J., PANELLA, P.J.E., and STEVENS, P.J.E.[*]

MEMORANDUM BY STEVENS, P.J.E.:                **FILED:  February 18, 2026**

J.M. ("Father") appeals from the orders entered in the Court of Common Pleas of Clarion County changing the placement goal of L.M. (born in January of 2018) and O.M. (born in September of 2021) (collectively "the Children") from reunification with biological parents to adoption, as well as involuntarily terminating his parental rights to the Children pursuant to Section 2511 of the Adoption Act, 23 Pa.C.S.A. §§ 2101-2938.[1]  After our careful review, we affirm the orders.

The relevant facts and procedural history are as follows: On August 30, 2023, Clarion County Children and Youth Services ("CYS") filed dependency petitions as to the Children. Therein, CYS alleged that, since January 21, 2016,

_____

[*] Former Justice specially assigned to the Superior Court.

[1] Mother's parental rights were also involuntarily terminated as to the Children, and she filed appeals to this Court, which are docketed at 1031 WDA 2025 and 1032 WDA 2025.  Mother's appeals are addressed in a separate decision.

- 2 -

CYS had received seventeen referrals on the family for various issues, including truancy, lack of healthcare, and mental health concerns related to the Children, as well as the parents' substance use and homelessness. The most recent referrals occurred on July 14, 2023, and August 21, 2023, and after investigation, the referrals were found to be valid.

Specifically, CYS alleged the family was homeless, the Children had not received routine medical care, and Father, as well as J.M., had unaddressed mental health concerns. CYS indicated that it referred the family for various services; however, Mother and Father (collectively "the parents") would not cooperate or communicate with CYS. The juvenile court appointed counsel for Father and Mother, as well as a guardian *ad litem* for the Children.

Following a hearing, on September 22, 2023, the juvenile court found the Children to be dependent and transferred legal custody to CYS. The parents retained physical custody of the Children, and the juvenile court set various goals for the parents. Specifically, the juvenile court directed them to cooperate with CYS, meet regularly with CYS, permit CYS access to their home upon CYS's request, and participate/cooperate with all recommended services, including drug and alcohol treatment. The juvenile court also directed the parents to cooperate with CYS to explore kinship resources for the Children in the event it became necessary to place them with a relative.

On March 11, 2024, following a permanency review hearing, the juvenile court found the Children to be dependent and placed the Children in foster

care. The juvenile court found that, on January 19, 2024, the Children had been left in a hotel room under the care of Father, who was under the influence of a substance to the point he was rendered unconscious. Father was arrested in connection with this incident and convicted of endangering the welfare of children. The juvenile court noted Mother, despite being aware of Father's condition, left the Children in Father's care.

Further, in placing the Children in foster care, the juvenile Court found Mother and Father had both tested positive for methamphetamine; Father admitted he continued to use methamphetamine; and Mother began treatment for her drug addiction but did not participate regularly therein. The juvenile court determined L.M.'s educational, mental health, and dental needs had not been addressed by the parents. The juvenile court noted the Children did not have beds. The juvenile court found the parents had been minimally compliant with their permanency plan goals. The placement goal for the Children was return to parents with a concurrent goal of adoption.

On August 23, 2024, following a permanency review hearing, the juvenile court retained the placement of the Children in foster care. The juvenile court found the parents had been minimally compliant with their permanency plan goals. The juvenile court noted the parents were living in a shed, which lacked electricity, heat, and restroom facilities. Neither Father nor Mother successfully completed their drug and alcohol treatment programs. CYS had difficulty locating and communicating with the parents. Father was

unemployed while Mother worked at a gas station. The placement goal for the Children was reunification with the parents with a concurrent goal of adoption.

On January 10, 2025, following a permanency review hearing, the juvenile court retained the placement of the Children in foster care. The juvenile court found the parents had been minimally compliant with their permanency plan goals. Neither Father nor Mother successfully completed their drug and alcohol treatment programs. Father admitted that he continued to use methamphetamine. The parents did not have stable housing and did not communicate with CYS. In the January 10, 2025, orders, the juvenile court retained the placement goal for the Children as return to parents with a concurrent goal of adoption.

CYS filed petitions in the juvenile court to change the Children's goal to adoption. Further, on May 2, 2025, CYS filed in the orphans' court petitions to involuntarily terminate the parental rights of Father and Mother as to the Children pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b).

On July 8, 2025, the matter proceeded to an evidentiary hearing at which Father and Mother, as well as their respective attorneys, were present. Further, the Children were represented by their guardian *ad litem*, Zachary Shekell, Esquire, and separate legal counsel, Levieta Lerch, Esquire.

Sherry Casher, the acting director of CenClear's substance use disorder ("SUD") treatment program, testified it is the regular business practice of

CenClear to keep records of attendance. N.T., 7/8/25, at 7. She testified Mother was a client of the SUD treatment program during 2024 and 2025. *Id.* at 8. Specifically, she testified Mother entered the SUD treatment program on January 31, 2024, and she attended sessions on February 6, February 20, February 27, March 5, and April 17, 2024. *Id.* at 9. Mother either cancelled or failed to show for scheduled sessions on February 7, February 14, March 12, March 19, April 1, April 11, and April 23, 2024. *Id.*

Ms. Casher testified CenClear's policy is that, after the third no-show, a client is "discharged unsuccessfully" from the SUD treatment program. *Id.* at 11. She noted Mother was provided with a letter dated April 12, 2024, warning her that she could be discharged from the SUD treatment program for missing sessions and directing her to attend a session on April 17, 2024, at 4:00 p.m. *Id.* Ms. Casher confirmed Mother attended the April 17, 2024, session; however, she did not show for the April 23, 2024, session. *Id.* at 12. On May 30, 2024, Ms. Casher sent Mother an "unsuccessful discharge letter" due to her failure to comply with the attendance policy. *Id.*

Ms. Casher noted that, after an unsuccessful discharge, a client may be reinstated thirty days later. *Id.* at 13. On November 11, 2024, Mother entered the SUD treatment program for the second time; however, Mother failed to appear for either the first scheduled session on November 11, 2024, or the second scheduled session on November 18, 2024. *Id.* Mother attended a session on November 27, 2024. *Id.* at 14. She was then a no-show for the

session on December 10, 2024, and she cancelled her session for December 16, 2024. *Id.* at 15. Mother attended a session on December 30, 2024. *Id.* Mother did not attend any sessions in January of 2025; she was a no-show for sessions on January 9, 2025, and January 21, 2025. *Id.* at 16. Accordingly, on February 28, 2025, Mother was "unsuccessfully discharged" from the SUD treatment program, and a letter so stating was sent to Mother on March 3, 2025. *Id.* at 17. Ms. Casher confirmed Mother was "unsuccessfully discharged" due to having more than three no-shows, which violated CenClear's attendance policy. *Id.* Mother has received no further treatment from CenClear. *Id.*

Ms. Casher testified Father was also a client at CenClear in 2024 and 2025. *Id.* at 18. Specifically, she testified that Father entered the SUD treatment program on December 12, 2024, but he attended no other sessions in December of 2024. *Id.* Specifically, he cancelled his session for December 13, 2023, and he was a no-show for sessions on December 18 and 30, 2024. *Id.* Father attended a session on January 24, 2025; however, he was a no-show on January 6 and 13, 2025. *Id.* at 19. Accordingly, on March 4, 2025, Father was "unsuccessfully discharged" from the SUD treatment program. *Id.* at 20. Ms. Casher confirmed Father was discharged due to having more than three no-shows, which violated CenClear's attendance policy. *Id.* Ms. Casher noted the discharge letter informed Father that there was a thirty-day waiting

period for Father to re-enroll in the SUD treatment program. *Id.* Ms. Casher testified Father did not seek to re-enroll thereafter. *Id.* at 21.

On cross-examination, Ms. Casher admitted that Mother cancelled two of her appointments because of work conflicts; however, she indicated the cancellations were not "held against her." *Id.* at 22. Rather, it was Mother's no-shows, *i.e.*, failing to contact CenClear to report that she would not be attending the sessions, which resulted in her unsuccessful discharge from the SUD treatment program. *Id.* Ms. Casher noted she did not know whether Mother participated in any other treatment programs outside of the CenClear system. *Id.*

Ms. Casher indicated that neither Mother's nor Father's charts contained any notations that they cancelled sessions because of health problems. *Id.* at 25. She noted that, if Mother or Father had reported health problems, they may have been given leniency before being unsuccessfully discharged. *Id.* In any event, she noted Mother and Father each had more than three no-shows before they were unsuccessfully discharged, and, therefore, they were both given leniency by CenClear. *Id.*

Probation Officer Sarah Mosley testified she is a probation officer, and after Father was placed on probation in connection with his conviction for endangering the welfare of children, she began supervising him. *Id.* at 27. Officer Mosley noted that, in early November of 2024, Father was diagnosed with cancer, so the probation office showed him leniency in terms of meeting

various probation requirements; however, he was required to submit to random drug screens. *Id.* at 28.

Officer Mosley testified that, throughout his probation supervision, Father repeatedly admitted to using drugs. *Id.* at 29. On December 18, 2024, Father signed an admission form indicating that he had used methamphetamine on seven or eight occasions since his release from prison with the most recent use on December 17, 2024. *Id.* On January 28, 2025, Father signed an admission form indicating that he used methamphetamine on January 21, 2025; on March 21, 2025, Father signed an admission form indicating that he used methamphetamine on March 16, 2025; on April 11, 2025, Father signed an admission form indicating that he used methamphetamine on April 6, 2025, and marijuana on April 10, 2025; on April 24, 2025, Father signed an admission form indicating he used methamphetamine on April 22, 2025; and, on May 6, 2025, Father signed an admission form indicating he used marijuana on May 6, 2025. *Id.* at 30-35. Officer Mosley testified that May 6, 2025, was the last time she saw Father. *Id.* at 35. He was a "no-show" for his May 14, 2025, probation appointment. *Id.* at 36.

Moreover, Officer Mosley testified about a specific incident occurring on March 21, 2025. She noted that Father had failed to report to the probation office as required for several weeks, so on March 21, 2025, Officer Mosley made an unscheduled visit to the apartment listed as Father's last known

address. *Id.* Despite knocking on the door for half an hour with evidence that Father was inside, no one answered the door. *Id.* at 37. Accordingly, Officer Mosley called for back-up, and when other officers arrived, one of them kicked down the door to gain entry. *Id.*

Mother and Father were found inside the apartment hiding in a closet. *Id.* The apartment was cluttered with garbage and "handfuls" of needles lying on the floor. *Id.* at 38, 43. Father admitted that he had used methamphetamine but denied using the needles. *Id.* at 39. Mother indicated that she had used the needles to inject herself with suboxone. *Id.* Mother was arrested and charged with possession of drug paraphernalia. *Id.*

Officer Mosley noted that Father's admitted drug use and failure to report were violations of his probation, and, thus, the court scheduled a probation revocation hearing for the end of April 2025, but the hearing was continued until June 26, 2025. *Id.* at 40. However, Father failed to appear for the probation revocation hearing on June 26, 2025, and the criminal court issued a warrant for his arrest. *Id.* at 41. Officer Mosley testified that, when Father appeared for the instant termination hearing on July 8, 2025, he was informed that he would be actively detained after the hearing. *Id.*

On cross-examination, Officer Mosley clarified that Mother reported that she "frequently injects her[self with] suboxone." *Id.* at 43. Officer Mosley noted that Mother was not on probation as of March 21, 2025, so she did not question Mother further about her drug use. *Id.*

Erin Schrecengost testified she was initially the CYS caseworker assigned to the instant matter. *Id.* at 46. She confirmed the Children were adjudicated dependent on September 22, 2023, based on housing instability and drug use by the parents. *Id.* While the Children initially remained in the physical custody of the parents, they were removed from the parents' custody on March 11, 2024, and placed in foster care due to the parents' lack of sobriety. *Id.* at 47.

Ms. Schrecengost confirmed Father was arrested on January 19, 2024, after he was found unresponsive in a hotel while caring for the Children. *Id.* The police found "drug paraphernalia, multiple knives, and syringes lying on the floor in the hotel room." *Id.* Father was charged with two counts of endangering the welfare of children in connection with this incident. *Id.* at 48. Father was incarcerated from January 19, 2024, to February 13, 2024. *Id.* Ms. Schrecengost testified that Mother admitted she left the Children in Father's care knowing that he had been using drugs. *Id.*

Regarding Mother's and Father's permanency plan goals, Ms. Schrecengost noted both parents struggled to maintain their sobriety, and on March 12, 2024, both parents tested positive for methamphetamine and amphetamine. *Id.* at 50. On April 24, 2024, Mother tested positive for methamphetamine and amphetamine; Father tested negative but admitted that he had used methamphetamine approximately one week earlier. *Id.* Although Mother attended an intake appointment in January of 2024 for

CenClear, she missed seven appointments and was unsuccessfully discharged on May 30, 2024. *Id.* Mother went to Pyramid Healthcare for inpatient treatment on July 18, 2024, but she left just two days later against medical advice. *Id.* Mother returned to Pyramid Healthcare on July 31, 2024; however, she left on August 18, 2024, before completing the program and against medical advice. *Id.* Mother received no further drug or alcohol treatment until November 11, 2024, when she attended an intake appointment at CenClear. *Id.* at 51. However, thereafter, Mother did not consistently attend sessions, and she was unsuccessfully discharged from the program on February 28, 2025. *Id.*

Regarding Father, he first sought drug treatment when he attended an intake appointment on June 6, 2024, at the Armstrong, Indiana, Clarion Drug and Alcohol Commission ("the Commission"). *Id.* at 52. The Commission's recommendation was that Father participate in inpatient rehabilitation, which Father attempted to do on five separate occasions thereafter. *Id.* Specifically, Father went to Cove Forge in June of 2024, but he was there for only a few days. *Id.* He then went to Pyramid Healthcare on June 28, 2024, but he left on June 29, 2024, because he was not receptive to intervention. *Id.* at 53. Father returned to Pyramid Healthcare on July 9, 2024, but he left on July 12, 2024, against medical advice. *Id.* Father returned to Pyramid Healthcare on July 31, 2024, but he left on August 2, 2024, without notifying the staff. *Id.* Father returned to Pyramid Healthcare on August 2, 2024, approximately two

hours after he had left, where he remained until August 18, 2024. *Id.* Father revoked his release of information with Pyramid Healthcare, so CYS was unable to get any further information thereafter. *Id.* at 54.

Ms. Schrecengost testified that Father received no drug or alcohol treatment after he left Pyramid Healthcare on August 18, 2024, until December 12, 2024, when he appeared for an intake appointment with CenClear. *Id.* However, following his intake appointment, Father attended no sessions at CenClear in December and only one session in January of 2025. *Id.* Ms. Schrecengost testified that the instant case was transferred to a different CYS caseworker, Dakota Curran, in February of 2025, and, thus, Ms. Schrecengost's interaction with the family thereafter was limited. *Id.* As of February of 2025, neither Mother nor Father had achieved their housing goals or treatment goals with alcohol/drugs. *Id.* at 75. Mother completed her parenting class goal; however, Father did not. *Id.* at 78.

Ms. Schrecengost testified that, during the time frame when she was the family's CYS caseworker, she often had difficulty contacting the parents, and she "struggled" to obtain drug screens from them. *Id.* at 55. Ms. Schrecengost testified she conducted drug screens on Mother on September 20, 2024, December 27, 2024, January 24, 2025, January 28, 2025, and February 11, 2025. *Id.* With the exception of prescribed suboxone, Mother tested negative for all substances. *Id.* Ms. Schrecengost screened Father on December 27, 2024, January 28, 2025, and February 11, 2025; Father twice

tested negative for all substances but once tested positive for suboxone for which he had no prescription. *Id.* at 56. Ms. Schrecengost noted that she had been receiving updates from the probation department, including information that Father admitted to using drugs. *Id.*

Ms. Schrecengost indicated that, in addition to the permanency plan goal of consistently attending drug and alcohol treatment, which Mother and Father failed to do, they were also supposed to maintain safe, stable housing. *Id.* When the Children were removed from the parents' physical custody on March 11, 2024, the parents were struggling to maintain housing. *Id.* at 57.

Regarding the history of the parents' housing, Ms. Schrecengost testified that, on December 28, 2023, the family was residing with a family member, who allotted the family two bedrooms. *Id.* However, CYS's visit of the home on December 28, 2023, revealed one room was "completely filled with trash…and not being used as a living space[.]" *Id.* There were insufficient beds for the Children. *Id.* Because of the condition of the rooms, CYS contacted the state police, who then instructed the parents to take the Children to their maternal grandmother's home for the weekend to give the parents time to clean the two rooms and provide sufficient beds. *Id.* at 58. The parents improved the condition of the rooms but then moved out of the two rooms and into a shed on the property in June or July of 2024. *Id.* The shed had no heat, electricity, or running water. *Id.* Ms. Schrecengost testified that the shed was not an appropriate living space for the Children. *Id.*

The parents moved out of the shed in November of 2024, and into an apartment, which had a monthly rental payment of $725.00. *Id.* at 59. While Mother was employed at a gas station, Father was unemployed, and, thus, they received assistance to pay the security deposit and first month's rent. *Id.* However, thereafter, they were unable to meet the monthly rent obligation, and by January of 2025, they were facing eviction. *Id.*

Ms. Schrecengost testified that, in addition to the other permanency goals discussed above, Father had a goal to address and stabilize his mental health, including receiving a psychiatric evaluation. *Id.* at 60. However, as of May of 2024, Father had not taken any steps to address his mental health issues. *Id.* On December 27, 2024, Father reported to Ms. Schrecengost that, while he was in inpatient treatment for drugs and alcohol, he received a psychiatric evaluation. *Id.* Ms. Schrecengost received a copy of the evaluation, and she discovered that the evaluation was not completed because Father left the facility early. *Id.* at 61. Father did not go to another mental health provider to have the psychiatric evaluation completed. *Id.*

Ms. Schrecengost testified that both parents had the permanency plan goal of improving their parenting skill, and they were referred to the Triple P Parenting Program on December 26, 2023. *Id.* Mother completed the parenting program on October 31, 2024, after several months of noncompliance; however, Father did not complete the parenting program due to his incarceration. *Id.* at 62.

Ms. Schrecengost testified that both parents had the permanency plan goal of providing for the Children's medical, educational, and basic needs. *Id.* She noted L.M. had significant dental needs, which were revealed during a dental exam at school on December 8, 2023. *Id.* Specifically, L.M. had "six severely decayed teeth, and he was complaining of pain." *Id.* However, L.M. was unable to receive immediate treatment because the parents failed to turn in the necessary paperwork to the assistance office, thus allowing L.M.'s insurance coverage to lapse. *Id.* at 63. JusticeWorks tried to contact the parents to assist them; however, the parents would not answer their phones. *Id.* Finally, on February 14, 2024, with CYS paying, L.M. was examined by another dentist, who informed the family that L.M. needed dental surgery. *Id.* After L.M.'s insurance was reinstated, he had dental surgery on November 14, 2024. *Id.* at 64.

During this time, while he was attending Kindergarten, L.M. exhibited troubling behavior at school, including "flipping over desks and chairs[,] attempting to jump out of the window of the classroom[,] kicking, screaming, swearing, and hitting." *Id.* These behaviors occurred regularly when he was in school, and the school reached out to CYS indicating they were unable to control his behaviors. *Id.* On January 16, 2024, L.M. had a mental health assessment at Family Psychological, and he was diagnosed with ADHD and provisional conduct disorder. *Id.* at 65. L.M. was referred for further mental

health treatment; however, there was a delay in L.M. getting the treatment because his parents had allowed his insurance to lapse. *Id.*

Additionally, Ms. Schrecengost testified the school also reported that, from the beginning of the school year in the fall of 2023 to February of 2024, L.M. had thirty-one absences from school. *Id.* To address the truancy issue, the family was referred to JusticeWorks; however, this did not improve L.M.'s school attendance while he was in the parents' physical custody. *Id.*

Ms. Schrecengost testified that, after L.M. was removed from the physical custody of the parents and placed in foster care, his teachers reported that L.M.'s behavior improved. *Id.* Specifically, on April 9, 2024, L.M.'s teacher reported L.M. was acting less impulsively and able to calm down more quickly. *Id.* He has continued to improve while in foster care. *Id.* at 66. Moreover, Ms. Schrecengost testified that, when he came into care, L.M. was wearing glasses, and in fact, his parents had ordered him prescription glasses on November 22, 2023, and March 1, 2024. *Id.* However, CYS took L.M. to an eye appointment on April 21, 2024, and the doctor discovered L.M. was wearing "over the counter reading glasses rather than his prescription glasses that he should have been wearing." *Id.*

Regarding O.M., Ms. Schrecengost testified that she had not received vaccinations since she was four months old, and with CYS's permission, the foster parents took O.M. to a physician so that she is now current with her vaccination requirements. *Id.* at 67.

Ms. Schrecengost testified that, during the time she was the assigned caseworker for the family, the parents were difficult to reach by telephone, and they did not follow-up with service providers. *Id.* She noted that JusticeWorks attempted to provide services to the parents, including budgeting assistance; however, the parents were unsuccessfully discharged on December 16, 2024. *Id.* at 68. Ms. Schrecengost testified that JusticeWorks supervised weekly visits between the parents and the Children; however, the parents failed to appear for visits from July 9, 2024, to August 27, 2024. *Id.* At this point, because of the parents' failure to appear for visits, JusticeWorks changed the visits to bi-weekly. *Id.* at 69.

Ms. Schrecengost testified there have been concerns reported to CYS about the visits. *Id.* Specifically, Father has been observed bringing a backpack to the visits, going into the bathroom, and spending lengthy periods of time in the bathroom with the backpack. *Id.* Also, L.M. reported after a visit that Mother told him to tell "the judge that he wanted to live with his grandmother." *Id.* at 70. Ms. Schrecengost noted that maternal grandmother was investigated as a possible resource for the Children; however, she already has Mother's three older children in her care. *Id.* at 83. When a visit was cancelled due to the parents failing to confirm in a timely manner, Father sent angry text messages to a supervisor at JusticeWorks, and he then appeared at the JusticeWorks office, cursing and yelling at the supervisor. *Id.*

As of February of 2025, when Ms. Schrecengost ceased being the caseworker for the family, visits were occurring at the JusticeWorks offices. Following the visits, L.M. became "moody" and would not listen to his foster parents. *Id.* at 71. O.M. struggled with problematic behaviors after she visited with the parents. *Id.* Ms. Schrecengost noted that O.M. has been placed in a kinship home with Mother's cousin, and L.M. has been placed in a separate foster home. *Id.* She noted CYS tried to keep the Children together; however, they were unable to find a foster family willing to accept responsibility for both.

At the time Ms. Schrecengost ceased being the caseworker, L.M. was doing "great in the foster home;" he called his foster parents "mom" and "dad;" and he seemed to get along with the other children in the home. *Id.* at 72. L.M. attended therapy weekly, and he was performing better in school since being placed with his foster parents. *Id.* at 73. O.M. called her foster parents "mom" and "dad," and she played well with the other children in the home. *Id.* She received speech therapy. *Id.* at 74. Based on her observations, Ms. Schrecengost opined that the Children reacted better to their respective foster parents, who have indicated a desire to adopt the Children, than they did to Mother and Father. *Id.*

Dakota Curran testified he became the CYS caseworker for the family in February of 2025. *Id.* at 91. On February 11, 2025, he attended a visit between the Children and the parents. *Id.* at 92. On this day, Father tested

negative for all substances, and Mother tested positive for her prescribed suboxone. *Id.* Mother reported she quit her job at a gas station because the "owner was trying to pin [a] robbery on her." *Id.* At this time, Father was receiving social security disability payments. *Id.* The parents' rent was past due, but Community Action paid the rent on March 5, 2025. *Id.* at 93.

Mr. Curran testified neither parent has met their goal of receiving alcohol/drug treatment. *Id.* at 96. He went to the parents' apartment on March 11, 2025, and March 19, 2025; however, no one answered the door. *Id.* Mr. Curran confirmed that, on March 21, 2025, a probation officer and the state police entered the apartment and found the parents inside. *Id.* at 97. Mother was charged with possession of drug paraphernalia in connection with the March 21, 2025, incident. *Id.* at 98.

Mr. Curran testified he visited the apartment on March 26, 2025, and Father answered the door. *Id.* at 99. Father told Mr. Curran that he was having difficulty attending drug and alcohol treatment because he was receiving cancer treatment. *Id.* However, in the same conversation, Father reported he had been discharged from cancer treatment because he missed too many appointments. *Id.* at 100. Mr. Curran indicated that Father often cited his cancer diagnosis as the reason he could not achieve permanency plan goals; however, Mr. Curran discovered Father was not "actually attending that [cancer] treatment consistently." *Id.* at 101. In fact, as of March of 2025, he had been "kicked out" of the cancer treatment program for noncompliance.

*Id.* He noted that, during this time, Father admitted to the probation department that he was using methamphetamines, and despite Father claiming to have received drug treatment through the hospital where the cancer treatment was occurring, Father refused to provide proof of such drug treatment. *Id.*

On April 23, 2025, Mr. Curran had a meeting with Mother, who reported that Father was "using drugs badly, wasn't going to treatment, had trashed the apartment." *Id.* at 102. On April 28, 2025, Mother reported to Mr. Curran that Father moved out of the apartment, moved in with his mother, and signed the housing voucher over to Mother. *Id.* Mr. Curran noted he unsuccessfully attempted to contact Father for several weeks, and he then learned there was a bench warrant out for Father's arrest. *Id.* at 95. Mother has no source of income to support herself or the Children. *Id.* at 94.

On May 6, 2025, Mr. Curran attempted to drug screen both of the parents; however, the results were both "inconclusive." *Id.* Mother's urine sample did not "activate the temperature strip and was a small sample." *Id.* Father admitted to Mr. Curran that he smoked marijuana that morning and was taking a prescribed amphetamine; however, "inexplicably," Father's urine test came back negative for all substances. *Id.* at 103. Mother voluntarily gave a second urine sample on May 7, 2025; however, it again did not "activate the temperature strip." *Id.* Mr. Curran noted that CYS workers are not allowed to physically view parents while they are giving urine samples.

*Id.* Mother admitted that she had been using her prescribed suboxone inappropriately by injecting it. *Id.* at 104.

Mr. Curran testified that, since the time he took over as the CYS caseworker for the family, Mother has not met her goal of receiving drug or alcohol treatment, and she was incarcerated for a brief time on June 27, 2025, for failing to appear at a preliminary hearing in relation to the criminal charges stemming from the March 21, 2025, incident. *Id.* He also testified Father has not met his goal of receiving drug or alcohol treatment. *Id.* He opined that Mother does not have the resources to provide for the Children's medical or educational needs. *Id.* at 106. He also testified that, since Father refuses to receive proper medical care for his cancer, his health is an issue, and he otherwise cannot provide for the Children's medical or educational needs. *Id.* Mr. Curran further noted that Father had mental health issues, and, to his knowledge, Father has not received mental health treatment. *Id.* Father did not complete his parenting program goal during the time Mr. Curran was the caseworker. *Id.*

Mr. Curran testified that he would characterize Mother's and Father's compliance with the permanency plan goals as "minimal." *Id.* He indicated they are difficult to reach. *Id.* He noted the parents appeared for most visits with the Children; however, after the visits, L.M.'s behavior regressed with violent outbursts directed at other children. *Id.* at 109. O.M. showed concerns about being removed from her foster family. *Id.*

Mr. Curran noted L.M. and O.M. are currently with the same pre-adoptive foster families as they were when he took over the case in February of 2025. Both sets of foster parents have indicated a desire to continue allowing L.M. and O.M. to have a relationship with each other. *Id.* at 111, 123. He has observed L.M. calling his foster parents "mom" and "dad," and he seems very comfortable with them. *Id.* at 110. O.M. is "shy and "reserved" around Mother and Father; however, she is "open" and "engaging" with her foster parents. *Id.*

Mr. Curran testified that CYS's recommendation is that, due to fifteen months passing since the Children have been removed from the parents' care, and the parents have made minimal progress towards their goals, the goal for the Children should be changed from reunification with parents to adoption with the parents' rights being terminated. *Id.* at 112. He testified CYS believes this would be in the best interest of the Children so that they can have stability and a home environment that meets their basic needs, which neither Mother nor Father can provide at this point. *Id.*

L.M.'s foster father testified that L.M. has been in his home for approximately eight months, and when he began living there, he was aggressive and lashed out at other children. *Id.* at 130. He testified that, today, if L.M. lashes out, he accepts responsibility and apologizes. *Id.* L.M.'s foster father testified that, after visits with Mother and Father, L.M.'s behavior regresses with the school and bus driver reporting violent outbursts from L.M.

*Id.* at 131. L.M.'s foster father testified that L.M. is affectionate towards him and his wife. *Id.* at 132. He indicated that he has no doubt L.M. loves Mother and Father; however, L.M. has stated to him that he "just wants the process to be over." *Id.* L.M.'s foster father testified that, after a visit with Mother and Father, L.M. asked him to explain addiction. *Id.*

L.M.'s foster father testified that L.M. tells him and his wife that he "loves them," he calls them "mom" and "dad," and he gets along with the other children in the house. *Id.* at 133. He confirmed that, if Mother's and Father's parental rights are terminated, he would encourage L.M. and O.M. to visit each other, and he supports L.M. continuing with therapy. *Id.* He noted that his family attends church, and L.M. accompanies them. *Id.* at 134. He testified that he and his wife want to continue giving L.M. a "happy, healthy, and thriving" home. *Id.*

Mother testified she has lived in an apartment since November of 2024. *Id.* at 138. She testified it is a two-bedroom apartment; however, L.M. would have his own room while O.M. would share a bedroom with her. *Id.* at 139. Mother testified she has a voucher for housing. *Id.* She indicated Father moved out of the apartment upon her request because he had "become a little bit mentally abusive." *Id.* at 145. Mother testified she used to work at a gas station, and she is currently "living off her income tax refund." *Id.* at 140. She "might have a job at Perkins, and she is considering filing for disability…because [her] health has been pretty bad lately." *Id.* She noted

she recently had hand surgery. *Id.* She indicated she will be able to provide for the Children in "no more than two months" if she gets the job at Perkins or social security disability payments. *Id.* at 147.

She admitted that, when the Children were found dependent, the family did not have stable housing. *Id.* Mother acknowledged that "drug use and [lack of] appointments for [the Children's] medical" care are among the reasons the Children were removed from her and Father's care. *Id.* Mother acknowledged that last time she gave Mr. Curran urine samples the results were inconclusive. *Id.* at 143. She indicated he let the samples sit too long before testing them, which resulted in an incorrect urine temperature. *Id.* She noted that the prior test results were positive solely for suboxone, for which she has a prescription. *Id.* at 144. She acknowledged that she has been on suboxone for approximately eight years, but she wants to stop the drug because she no longer has a "desire for opiates." *Id.* at 159.

Regarding her permanency plan goal of drug and alcohol counseling, Mother testified she has been doing it "online." *Id.* at 144. Mother indicated she does not know the name of the treatment program, and she just "Googles" to watch treatment. *Id.* Mother indicated she did not go back to CenClear because the only location with openings is in Brookville, and her car is not currently operational. *Id.* Mother testified she has been sober since the end of July of 2024. *Id.* at 145. She indicated that "treatment does not define my sobriety," and she has remained sober without a formal treatment

program. *Id.* at 153. However, she admitted that completing drug and alcohol treatment was one of her permanency plan goals. *Id.* at 154.

Mother testified she visits the Children, and during the visits, the Children ask to go home with her and are affectionate towards her. *Id.* at 141. She indicated she brought gifts and toys to visits, but L.M. told her to not buy him presents because he wants the money to go towards Mother's apartment. *Id.* L.M. is "scared of us losing the apartment." *Id.*

Mother testified that she has three older children (ages 17, 15, and 9), and in her opinion, it would be detrimental to break the bond L.M. and O.M. have with these children. *Id.* at 142. She acknowledged that her older children have lived with maternal grandmother for "several years," and she has allowed them to do so because they need stability. *Id.* at 162. She indicated her bond with the Children has not been assessed. *Id.* at 146. Mother testified she loves the Children, and she wants them to be home with her. *Id.* at 149.

She acknowledged L.M. and O.M. have bonds with their respective foster parents, so if the Children are returned to her care, she would seek counseling for them and allow the foster parents to visit the Children. *Id.* Mother testified she would have the means to take the Children to medical visits because maternal grandmother has a car. *Id.* at 148.

Maternal grandmother testified L.M. and O.M. are "close" with their three older siblings; however, they have not had regular visits since L.M. and

O.M. were found to be dependent. *Id.* at 172. Maternal grandmother testified Mother and Father separated in April of 2025, and she believes the "toxic" relationship played a part in the Children being removed from the parents' care. *Id.* at 173. Maternal grandmother testified that, since Mother separated from Father, she has been more active with the older children. *Id.* at 174.

Maternal grandmother testified Mother has issues with her hands and legs. She echoed Mother's testimony that, in the next two months, Mother would be ready to assume care and responsibility for L.M. and O.M. *Id.* Maternal grandmother testified Mother loves the Children, and in her opinion, there is a bond between them worth preserving. *Id.* at 176. She testified the Children are "momma's babies." *Id.*

Maternal grandmother confirmed Mother's three older children have lived with her for three years. *Id.* at 177. She testified it was necessary for these children to live with her because Mother has not had a large enough house. *Id.* Maternal grandmother confirmed that the police came to her house because of behaviors involving one of Mother's older children, who is autistic. *Id.* at 178. Maternal grandmother acknowledged that she was given an opportunity to be a kinship resource for L.M.; however, she did not turn in the necessary paperwork. *Id.* at 179. She testified that she sought help from the foster care licensing agency, and "everyone just ignored [her] attempts to be licensed." *Id.* She admitted that, when the Children were removed from the parents' physical custody, she was living in a two-bedroom apartment with

the three older children and her boyfriend. *Id.* at 186. However, she is now living in a larger residence. *Id.*

Maternal grandmother testified that she was with Mother when she asked Mr. Curran for help to get Father out of the apartment in the spring of 2025, and Mr. Curran said he would talk to his supervisors. *Id.* at 180. Maternal grandmother testified that Mother never received help thereafter from Mr. Curran. *Id.*

Father testified he resides with paternal grandmother, and on November 3, 2024, he was diagnosed with cancer of the esophagus and lymph nodes. *Id.* at 188. He indicated he underwent chemotherapy, which undermined his ability to meet some of his permanency plan goals, including drug and alcohol treatment. *Id.* at 190. He admitted that he did not finish his prescribed rounds of chemotherapy, and in approximately April of 2025, he was discharged after he missed several appointments. *Id.* at 192. He began seeing an oncologist at a different location. *Id.*

Father testified he has been going to Clarion Family Therapy for mental health, and Crossroads every two weeks for drug and alcohol counseling. *Id.* He indicated he began drug and alcohol counseling approximately two months prior to the termination hearing, and he is taking prescribed Adderall and suboxone. *Id.* at 193. He also completed parenting classes while he was incarcerated. *Id.* at 194. Father testified he realizes he has an addiction, and he is ready to address it. *Id.* at 198.

Father testified that he wants L.M. and O.M. to be returned to Mother's custody or, alternatively, placed with maternal grandmother. *Id.* at 201. He acknowledged that he was not in a position to take custody of the Children because of his outstanding criminal matter; however, he is trying to get to a position where he can be a "better parent" and would like visitation. *Id.* at 202. He testified he and Mother love the Children, and they should be with family. *Id.* He testified he is bonded with the Children, as is Mother. *Id.* at 203.

Father admitted that, as of June 26, 2025, he was staying at a friend's house, and he used methamphetamine two days prior to the termination hearing. *Id.* Father admitted that he feels "hopeless," and he is a drug addict. *Id.* at 206. He acknowledged that, as of the day of the termination hearing, he was unable to care for the Children because he is an active drug addict. *Id.* at 215. He indicated that his cancer diagnosis prevented him from meeting his permanency plan goals, but it did not stop him from going outside the home, purchasing methamphetamine, and consuming it. *Id.* at 207.

Father admitted he had not seen his probation officer since May 6, 2025, and he did not attend a court hearing on June 26, 2025. *Id.* at 215. Father indicated he tried to remain free so that he could attend the termination hearing. *Id.* Father indicated that Mother transported him for his chemotherapy appointments, which resulted in her missing visits and other appointments regarding the Children. *Id.* at 217. He noted that Mother has

always been better with the Children whereas he has "always been kind of a slouch." *Id.*

Thereafter, the juvenile court entered orders changing the Children's permanency goal to adoption. The orphans' court also entered orders involuntarily terminating Father's parental rights to the Children pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b). With the assistance of counsel, Father filed timely, separate notices of appeal as to each child from the juvenile court's orders entered in the dependency matter, as well as from the orphans' court's orders entered in the termination matter. Father also filed contemporaneous concise statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b) in both matters, and Clarion County President Judge Sara J. Seidle-Patton filed responsive Pa.R.A.P. 1925(a) opinions.[2] This Court *sua sponte* consolidated Father's notices of appeal.

On appeal, Father presents the following issues in his "Statement of the Questions Involved" (verbatim):

Change of Goal
1. The Juvenile Court erred in determining that the change of goal from reunification with natural father to adoption is in the best interest of the subject Children at the present time when the natural parents clearly maintained a strong and ongoing bond with the Children, Father spent many of the months preceding the filing

---

[2] We note that President Judge Seidle-Patton presided over both the dependency matters in the juvenile court, as well as the termination matters in the orphans' court.

- 30 -

of the termination petition battling cancer, which diminished his ability to work toward reunification, and the maternal grandmother was willing, able, and appropriate to accept the Children in a family placement setting, which would have avoided the destruction of the Children's familial ties while allowing the Children to reside with the maternal grandmother in a safe environment.

2. The decision of the Juvenile Court to change the goal to adoption was not supported by substantial evidence in the record.

Involuntary Termination of Parental Rights

1. The Orphans' Court erred in determining that the termination of the parental rights of the natural parents is in the best interests of the subject Children at the present time when the natural parents clearly maintained a strong and ongoing bond with the Children, Father spent many of the months preceding the filing of the termination petition battling cancer, which diminished his availability to work toward reunification, and the maternal grandmother was willing, able, and appropriate to accept the Children in a family placement setting, which would have avoided the destruction of said bond while allowing the Children to reside with the maternal grandmother in a safe environment.

2. The decision of the Orphans' Court to terminate the parental rights of Father was not supported by clear and convincing evidence.

Father's Brief at 5-6.

Initially, we note that it is well-settled that, if this Court affirms a termination of parental rights, it renders moot any challenge to the goal change. *See In re Adoption of A.H.*, 247 A.3d 439, 446 (Pa.Super. 2021) ("[T]he effect of our decision to affirm the orphans' court's termination decree necessarily renders moot the dependency court's decision to change the goal to adoption."). Accordingly, we begin our analysis by examining Father's issues related to the involuntary termination of his parental rights to the Children.

Our standard of review is well-settled:

In an appeal from an order terminating parental rights, our scope of review is comprehensive: we consider all the evidence presented as well as the orphans' court's factual findings and legal conclusions. However, our standard of review is narrow: we will reverse the orphans' court's order only if we conclude that the orphans' court abused its discretion, made an error of law, or lacked competent evidence to support its findings. The orphans' court's judge's decision is entitled to the same deference as a jury verdict.

*In re L.M.*, 923 A.2d 505, 511 (Pa.Super. 2007) (citations omitted). Further,

we have stated:

Where the orphans' court's findings are supported by competent evidence of record, we must affirm the orphans' court even though the record could support an opposite result. We are bound by the findings of the orphans' court which have adequate support in the record so long as the findings do not evidence capricious disregard for competent and credible evidence. The orphans' court is free to believe all, part, or none of the evidence presented, and is likewise free to make all credibility determinations and resolve conflicts in the evidence. Though we are not bound by the orphans' court's inferences and deductions, we may reject its conclusions only if they involve errors of law or are clearly unreasonable in light of the orphans' court's sustainable findings.

*In re M.G.*, 855 A.2d 68, 73-74 (Pa.Super. 2004) (citations omitted).

The involuntary termination of parental rights is governed by Section 2511 of the Adoption Act, which requires a bifurcated analysis. The orphans' court must initially determine whether the conduct of the parent warrants termination under Subsection 2511(a). Only if the court determines that the petitioner established grounds for termination under Subsection 2511(a) does it then engage in assessing the petition under Subsection 2511(b), which involves a child's needs and welfare. *In re T.S.M.*, 620 Pa. 602, 71 A.3d 251,

267 (2013). To involuntarily terminate parental rights, the petitioner must prove grounds under both Subsections 2511(a) and (b) by clear and convincing evidence. *Id.*

Instantly, the orphans' court terminated Father's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b). In order to affirm the termination of parental rights, this Court need only agree with the orphans' court's findings under any one enumerated Subsection of 2511(a), as well as 2511(b). *See In re B.L.W.*, 843 A.2d 380, 384 (Pa.Super. 2004) (*en banc*).

In this case, we review the order involuntarily terminating Father's parental rights pursuant to Subsections 2511(a)(8) and (b), which provide as follows:

> **(a) General Rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> ***
>
> (8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.
>
> ***
>
> **(b) Other considerations**.—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant

to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(8), (b) (bold in original).

Pursuant to Subsection 2511(a)(8), the petitioner must prove (1) the child has been removed from parental care for 12 months or more; (2) the conditions which led to the removal or placement of the child continue to exist; and (3) the termination of parental rights would best serve the needs and welfare of the child. This Court has explained:

> Unlike other subsections, § 2511(a)(8) does not require the court to evaluate a parent's willingness or ability to remedy the conditions that led to the placement of the child[.] **In re M.A.B.**, 166 A.3d 434, 446 (Pa.Super. 2017). "[T]he relevant inquiry" regarding the second prong of § 2511(a)(8) "is whether the conditions that led to removal have been remedied and thus whether reunification of parent and child is imminent at the time of the hearing." **In re I.J.**, 972 A.2d 5, 11 (Pa.Super. 2009). Further, the Adoption Act prohibits the court from considering, as part of the § 2511(a)(8) analysis, "any efforts by the parent to remedy the conditions described [in the petition] which are first initiated subsequent to the giving of notice of the filing of the petition." 23 Pa.C.S.A. § 2511(b).
>
> Although § 2511(a) generally focuses on the behavior of the parent, the third prong of § 2511(a)(8) specifically "accounts for the needs of the child." **In re C.L.G.**, 956 A.2d 999, 1008-09 (Pa.Super. 2008) (*en banc*). This Court has recognized "that the application of [§ 2511(a)(8)] may seem harsh when the parent has begun to make progress toward resolving the problems that had led to the removal of his or her child[.]" **In re Adoption of R.J.S.**, 901 A.2d 502, 513 (Pa.Super. 2006).
>
> However, by allowing for termination when the conditions that led to removal of a child continue to exist after a year, the statute implicitly recognizes that a child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities. The court cannot and will

not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future. Indeed, we work under statutory and case law that contemplates only a short period of time…in which to complete the process of either reunification or adoption for a child who has been placed in foster care.

***In re M.E.***, 283 A.3d 820, 832 (Pa.Super. 2022) (citation omitted).

Subsection 2511(b) requires the court to "give primary consideration to the developmental, physical and emotional needs and welfare of the child" when considering whether to involuntarily terminate parental rights. 23 Pa.C.S.A. § 2511(b). Our Supreme Court, in ***In re E.M.***, 533 Pa. 115, 620 A.2d 481 (1993), first recognized that the "emotional needs and welfare" analysis under Subsection 2511(b) should include, in part, the child's bond with his or her parent. In doing so, the Court later articulated that the effect on the child of severing a bond with a parent requires "a determination of whether the bond is necessary and beneficial to the child, *i.e.*, whether maintaining the bond serves the child's developmental, physical, and emotional needs and welfare." ***In the Interest of K.T.***, ___ Pa. ___, 296 A.3d 1085 (2023).

In concluding that CYS proved the grounds for termination by clear and convincing evidence under Subsections 2511(a)(8) and (b), the orphans' court relevantly indicated the following:

> On September 22, 2023, [the Children were] declared dependent for concerns with housing instability and the parents' drug use. [The Children have] three older half-siblings[, who reside with maternal grandmother]. On January 19, 2024, Father was found unresponsive in a hotel room while caring for O.M. and

L.M. Father was arrested for two counts of endangering the welfare of children. Father was drug screened and tested positive for methamphetamines. On March 11, 2024, [the Children] were placed in foster care.

Since the Children were declared dependent and placed in foster care, Father was tasked with actively engaging in drug and alcohol counseling, mental health counseling, obtaining stable housing, and completing a parenting skills program. Father said he attempted inpatient rehabilitation five different times. Father was unsuccessfully discharged from outpatient drug and alcohol treatment on March 4, 2025. Father tested positive for methamphetamines and/or marijuana repeatedly between December 2024 and May 2025. He also admitted to [drug] use. In March 2025, a field visit by Father's probation officer to his residence led to a forceable entry as he and [Mother] would not answer the door for the probation officers. He currently admits to being an active addict, using just a few days before the involuntary termination hearing. Furthermore, Father was diagnosed with cancer in November 2024 and was to be participating in [cancer] treatments during that time. His compliance with cancer treatment was reportedly sporadic.

Father says he completed a parenting program while incarcerated in 2024. Father resided with Mother until April 2025 but now says he is living with his mother and stepfather[.] He is unemployed and receives social security income. Father never completed an evaluation for his mental health; he has not communicated with [CYS] since May 2025; and he failed to appear for a probation violation hearing in June 2025, causing probation to issue a warrant for his arrest.

As of the date of the hearing on the petition, [the Children] have been in foster care for fifteen months, with no progress by Father from abstaining from drug use, obtaining stable housing, or demonstrating an ability to care for the [Children].

\*\*\*

Father contends the orphans' court abused its discretion in finding that his parental rights should be terminated in the best interests of the Children [pursuant to Subsection 2511(b)]. Father's parental rights were terminated pursuant to 23 Pa.C.S.A. § [2511(a)(8) and (b)] with the court's focus on the developmental, physical, and emotional needs, as well as the overall welfare, of the [Children]. L.M. has spent over fifteen months in foster care, developing a stable, loving bond with his

foster parents. Furthermore, L.M. has demonstrated significant progress with his behaviors and own development since being placed in foster care. He suffered from frequent bouts of physical aggression, which have significantly lessened during his time in care.

L.M.'s needs are not being adequately addressed by Father, and there is no indication that they will be met in the future. Father admits to being an active addict, as well as unable to care for the [Children]. Specifically, when asked whether he stopped using methamphetamine because of his cancer treatment, he stated, "Not at all. Burned through it." N.T., 7/8/25, at 206. Father fails to acknowledge the detrimental impact his drug use has had on L.M. Furthermore, Father acknowledged at the hearing when asked by [CYS] that he cannot take care of his Children as follows:

Q. Okay. As of today, you can't take care of your Children, correct, you're still in active addiction?

A. I can't.

N.T., 7/8/25, at 215.

For L.M.'s best interest, it is necessary to terminate Father's parental rights to ensure his stability and future well-being. The [orphans' court] did not base its decision on factors that are beyond the control of Father. Father's failure to demonstrate progress was completely within his control and a result of his personal decision-making. Most importantly, however, L.M. is flourishing in foster care. It is clearly in his best interest to gain a feeling of stability knowing that he will not be returned to the living situation that so dramatically impacted his growth and development.

Orphans' Court Opinion, filed 9/30/25 in 1021 WDA 2025, at 1-4 (some citations to record omitted).

Furthermore, the orphans' court finds O.M. has spent over fifteen months of her forty-four months of life in foster care, developing a stable, loving bond with her foster parents. Since being removed from Father's care, O.M. has demonstrated more playful and engaging behavior. O.M.'s needs are not being actively addressed by Father, and there is no indication that they will be in the future. Father admits to being an active drug addict, as

well as unable to care for [the Children]….Father fails to acknowledge the detrimental impact his drug use had on O.M….For O.M.'s best interest, it is necessary to terminate Father's parental rights to ensure her stability and future well-being. This Court did not base its decision on factors that are beyond the control of Father.

Orphans' Court Opinion, filed 9/30/25 in 1020 WDA 2025, at 3-4.

We find no abuse of discretion. *In re L.M.*, *supra* (setting forth our standard of review). With respect to the first prong of Subsection 2511(a)(8), the record demonstrates the Children have been removed from parental care for twelve months or more.

With respect to the second prong of Subsection 2511(a)(8), we agree with the orphans' court that CYS met its burden of proving the conditions which led to the removal or placement of the Children continue to exist. *See In re T.S.M.*, *supra* (setting forth the burden of proof in termination cases). Specifically, the Children were removed from Father's care due to Father's substance abuse and inability to provide stable housing for the Children. Despite Father being offered services, the conditions which led to the removal or placement of the Children continue to exist. Father failed to demonstrate he completed drug and alcohol treatment, or secured suitable housing for himself, let alone the Children. Thus, CYS met the second prong of Subsection 2511(a)(8).

With respect to the third prong of Subsection 2511(a)(8), we agree with the orphans' court that CYS proved termination of Father's parental rights will best serve the needs and welfare of the Children. *See In re T.S.M.*, *supra*.

The Children's mental, physical, educational, and behavioral needs are being met by their respective placement families, who intend to adopt the Children. The orphans' court found that the Children have developed stable, loving bonds with their respective foster families. Further, the orphans' court determined that the Children's need for permanency and stability is paramount in this case. Father admits that he is unable to provide for the Children. We discern no abuse of discretion. *In re L.M.*, *supra*.

Having determined the orphans' court properly found CYS met its burden under Subsection 2511(a)(8), we next examine whether the orphans' court properly found termination is in the best interests of the Children under Subsection 2511(b). *See In re C.L.G.*, 956 A.2d at 1009 (holding that, after we resolve the analysis of the "needs and welfare of the child" under Subsection 2511(a)(8), we must then address the "needs and welfare of the child" under Subsection 2511(b)). Bond, permanency, stability, and all other intangibles are "all of 'primary' importance in the Subsection 2511(b) analysis." *In the Interest of K.T.*, *supra*, 296 A.3d at 1109. It is within the province of the orphans' court to "consider the totality of the circumstances when performing a need and welfare analysis." *Id.* We will not disturb such an assessment if the orphans' court's factual findings are supported by the record.

Here, in examining the bond between Father and the Children, the court found that Father does not have a "healthy bond" with the Children. Juvenile

Court Opinion, filed 9/30/25 in 1014 WDA 2025, at 5-6. The court noted that L.M., in particular, worries about his parents because of their financial struggles and drug addiction, which in turn leads him to "carry the burden to try to remedy his parents' problems." *Id.* However, the Children have stable, loving bonds with their respective pre-adoptive foster parents. We conclude the court did not abuse its discretion in holding that, under the totality of the circumstances, it is necessary to sever any bond between Father and the Children so that the Children can have permanency and stability with their needs being met.[3] *In the Interest of K.T.*, *supra*.

Finally, to the extent Father seeks review of the Children's placement goal to adoption, we find the issue to be moot. As indicated *supra*, if this Court affirms a termination of parental rights, it renders moot any challenge to the goal change. *See In re Adoption of A.H.*, *supra*.

For all of the foregoing reasons, we affirm.

---

[3] We note that Father suggests there is "no legitimate reason the Children were not placed in kinship care with the maternal grandmother, who was familiar with the Children, already had custody of Mother's three older children, who have a close relationship with the subject Children, and took all the steps she could to meet the requirements to become a kinship guardian." Father's Brief at 12. To the contrary, the court found that maternal grandmother did not submit required paperwork in a timely manner to be a kinship resource for the Children, and when the Children were placed in foster care, maternal grandmother was living in a two-bedroom apartment with her boyfriend and Mother's three older children. Juvenile Court Opinion, filed 9/30/25 in 1014 WDA 2025, at 6. The court noted CYS made diligent efforts to place the Children with kinship resources, and, although they could find no kinship resource for L.M., they were successful with O.M., who was placed with Mother's cousin. *Id.*

Orders affirmed.

Judgment Entered.

*Benjamin D. Kohler*

Benjamin D. Kohler, Esq.
Prothonotary

DATE:  2/18/2026